# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RICHARD LANSING,

                    **BEFORE THE HONORABLE**
                    **CHARLES N. CLEVERT, JR.**

        **Plaintiff,**

        **v.**                       **Case No. 08-C-0240**

**YEARLY RETIREMENT BENEFIT CHECK**
**FUND OF PLUMBERS UNION LOCAL 75, et al.**

        **Defendants.**

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

---

Pursuant to Civil Local Rules 7.1 and 56.2 and Fed. R. Civ. P. 56, Plaintiff Richard Lansing, by his counsel, Garvey McNeil & Associates, S.C. and Petrie & Stocking, S.C., submits the following brief in response to Defendants' memorandum of law in support of the Defendants' motion for summary judgment.

### INTRODUCTION

The Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et. seq.* ("LMRDA") is federal legislation whose primary purpose is to address abusive labor practices such as, "corruption, disregarding the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct," and to protect a union member's rights and interests "as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives." 29 U.S.C. § 401(b). Congress enacted the LMRDA as a means to

preserve democracy within unions, protect union members who have been aggrieved by their leaders' abuses of power, and redress unreasonable and arbitrary actions by union officials. *Local 911 v. United Food and Commercial Workers Intern. Union*, 301 F.3d 468, 475 (6th Cir. 2002); *Wirtz v. Hotel, Motel and Club Emp. Union, Local 6*, 391 U.S. 492, 469-97, 88 S.Ct. 1743 (1968)(discussing Title IV of the LMRDA).

In this case, leaders of Plumbers and Gasfitters Local 75 ("Local 75" or "the Local") of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry ("UA") refused to implement a voted-upon measure that would provide an extra benefit to the union's retired members. In a secret ballot vote taken at a well-attended union meeting, conducted after the membership had received two meeting notices and after a great deal of discussion and debate, the members passed the measure by a substantial majority. The resolution was never implemented, however, because the union officers did not agree with it, and put simply, did not want to implement it.

Counsel for Plaintiff contacted both the Directors of Plumbers Local 75 and the UA Executive Board, on Plaintiff's behalf, informing them the Local officers' failure to act on the resolution breached their fiduciary duties to the union membership. The Directors and Executive Board took no remedial action. (Add'l FOF ¶¶ 36-37; Bensky Dec. ¶¶ 16-17.*)* Pursuant to 29 U.S.C. § 501(b), Plaintiff sought leave to file this complaint under the LMRDA by motion filed March 14, 2008. This Court found Plaintiff had shown good cause and granted the motion on March 26, 2008. (Stip. Facts ¶ 3.)

This Court has jurisdiction over the LMRDA claims pursuant to 29 U.S.C. § 501(b). (Stip. Fact, ¶ 2.) This action properly lies in this judicial district pursuant to 28

U.S.C. 1391(b) & (c) because the claims arose here, Plaintiff resides here, and Defendants are engaged in conducting business and representing and acting on behalf of employee-members in this judicial district. (Stip. Facts ¶ 3.)

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence on record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The summary judgment "standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986) (emphasis in original). "Genuine" issues are those upon which "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "Material" facts are identified by the substantive law of the case. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. (citations omitted).

After a moving party demonstrates "that there is an absence of evidence to support the nonmoving party's case," the burden shifts to the non-moving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25, 106 S.Ct. 2548 (1986). While all inferences must be drawn in the light most favorable to the non-moving party, *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999), the non-moving party may "not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248 (quoting *First*

*Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575 (1968) (internal quotations omitted)).

A movant may rely upon affidavits in support of summary judgment, and, such affidavits must be made on personal knowledge and set forth facts that are admissible in evidence. Fed. R. Civ. P. 56(e). However, the purpose of summary judgment is not to replace the conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Lujan v. Nat. Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the moving party's affidavits must not contain "statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).

Moreover, cases involving a person's state of mind, such as knowledge and intent, are generally factual issues inappropriate for resolution by summary judgment. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999). Thus, courts apply the summary judgment standard with "special scrutiny" in cases that turn on intent and credibility. *Geier v. Medtronic, Inc.* 99 F.3d 238, 240 (7th Cir. 1996).

In the present case, genuine issues of material fact preclude summary judgment in Defendants' favor. Therefore, the Defendants' motion must be denied.

## FACTS[1]

In early May, 2005, Plaintiff Lansing approached then business manager Harry Kreuser, a defendant herein, to discuss a possible motion to establish a pension benefit for retired members.[2] (PFOF ¶ 16; Lansing Dep. Pg. 47, 49-50.) The purpose of this motion was to assist retired members whose pensions had not increased in over 17 years.

---

[1] Plaintiff relies on the facts set forth in his Response to Defendant's Proposed Findings of Facts and the Plaintiff's Additional Proposed Findings of Fact. The following is a summary.
[2] Hereinafter the "13th Check Motion".

Case 2:08-cv-00240-CNC   Filed 11/13/09   Page 4 of 31   Document 62

(Add'l FOF ¶ 38; Lansing Dec. ¶ 15.) Lansing and fellow retired Local 75 member Mike Ligocki drafted a motion to be voted on at the upcoming membership meeting. (Stip. Facts ¶ 17.) This motion proposed deducting twenty cents per hour worked from working members' paychecks to create a fund that would provide retired members one additional benefit check per year. (Id.) It proposed two potential funding mechanisms: if the Pension Board of Trustees did not agree to fund the 13th Check Motion, the Local union would establish its own depository for the funds, collect the contributions via the "check-off procedure," and distribute those funds equally between the retirees.[3] (Id.)

Two separate notices were mailed to the membership informing them of the upcoming vote on the allocation of money for the retired members' benefit. (Add'l FOF ¶ 40; Kreuser Dep., 30:22-32:11; Ex. 68, 69.) At the May 24, 2005 membership meeting, after a great deal of discussion, the membership passed the motion by a 145 to 100 vote despite bitter opposition from Mr. Kreuser. (Stip. Facts ¶ 23; Add'l FOF ¶¶ 43-46; Engle Dep., 38:7-40:5, 51:21-23, 80:22-81:6, 9:15-10:17; 38:7-41:23, 40:23-41:23.) To date, the union leaders have not implemented the 13th Check Motion. (PFOF ¶ 34.) It was not until this law suit was filed, nearly three years after the motion had passed, that the officers attempted to justify why they refused to implement the motion. (Add'l FOF ¶ 47; Breitlow Dep., 92:10-19; Engle Dep., 77:16-78:20; Kreuser Dep., 51:7-14, 55:24-56:2; Lansing Dec. ¶¶ 9-12.)

---

[3] A dues check-off is a voluntary procedure Local 75 commonly uses to collect union dues and other payments to the union, such as contributions to the political action fund. Put simply, members' employers' deduct the authorized amount of money from members' paychecks and send that money to a third party administrator, who then sends the money to the Local. The Local deposits the money into various checking accounts. Some of these checking accounts are referred to in the Local bylaws as "funds." (Add'l FOF ¶ 39; Brietlow Dep., 31:13-33:6, 35:1-12; Ex. 6.)

5

ARGUMENT

**I.      Defendants breached their fiduciary duty under § 501 of the LMRDA**

The Seventh Circuit views the LMRDA expansively, and has held "[section 501] extends to every area in which subversion of the interests of the union membership may be accomplished by union officials or representatives bent on acting in culpable derogation of those interests."  *Hood v. Journeymen Barbers*, 454 F.2d 1347, 1354 (7th Cir. 1972).

Defendants assert that the Seventh Circuit follows the Second Circuit's narrow view of the scope of fiduciary duty owed under § 501, citing *Gurton v. Arons et al.,* 339 F.2d 371, 375 (2nd Cir. 1964).  (Def. Br. at 22.)  *Gurton* holds that § 501 may only be invoked to redress claims involving a union's money or property.  Defendants' argument that the Seventh Circuit holds the same is incorrect.  Moreover, because Plaintiff's claim does involve failure to expend union money, *Gurton* does not foreclose plaintiff's claim.

**A.      The 7th Circuit has not adopted *Gurton***

The Defendants erroneously state that the "Seventh Circuit has followed the lead of the Second Circuit by narrowly defining the scope of fiduciary duty that officers of a labor organization owe to the labor organization."  (Def. Br. at 22)(citing *Lux v. Blackman*, 546 F.2d 713, 718 (7th Cir. 1976), *Chathas v. IBEW Local 134*, 233 F.3d 508, 514 (7th Cir. 2000) and *Talbat v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 666 (7th Cir. 1992)).  These cases do not support the Defendants' position but rather demonstrate the Seventh Circuit has *not* adopted *Gurton* but holds an expansive view of § 501.  A brief history of § 501 analysis in the federal courts and Seventh Circuit shows Plaintiff Lansing's claim—that Local 75 officers' breached their fiduciary duty by failing to

6

implement the 13th Check Motion—fits squarely within the contours of § 501 jurisdiction.

Section 501(a) of the LMRDA states, in relevant part:

> The officers… of a labor organization *occupy positions of trust in relation to such organization and its members as a group.* It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members *and* to manage, invest, and *expend* the same in accordance with its constitution and bylaws *and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party* or in behalf of an adverse party in any matter connected with his duties *and* from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, *and* to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization….

29 U.S.C. § 501(a)(emphasis added).  The federal circuit courts are split over the scope of § 501(a), with the Second Circuit and Eighth Circuits representing opposite ends of the spectrum.  The Second Circuit limits the scope of fiduciary duty to conduct involving the union's money or property, whereas the Eighth Circuit reads § 501 to prohibit union officers, by virtue of their positions of trust within the union, from acting "adversely to their organization or to the members as a group."  *Gurton v. Arons et al.,* 339 F.2d 371, 375 (2nd Cir. 1964); *Johnson v. Nelson*, 325 F.2d 646, 650 (8th Cir. 1963).

In *Gurton*, the union leadership refused to implement a resolution that would require members to vote in person for union leadership.  Plaintiffs brought suit under § 501 to compel the officers to implement the new voting procedure.  339 F.2d at 372-73. The case facts showed that the resolution, if implemented, would effectively

disenfranchise the vast majority of union members, and thus the union officers were correct in refusing the implement the resolution, as it would have violated the bylaws of the International union. *Id.* Holding that "Section 501 of the L.M.R.D.A. has no application to the present controversy," the Second Circuit nonetheless addressed the merits and reviewed the union officers' actions applying an arbitrary and capricious standard, much as it would any administrative review. *Gurton* does not involve any duty with respect to the union officers' collection or expenditure of funds, and the court concluded the officers had acted in accordance with applicable union bylaws. *Id*. at 375.

The Eighth Circuit case, *Johnson v. Nelson,* involved a complicated fact scenario that boiled down to whether the union officers should be compelled, pursuant to § 501, to pay the attorneys fees for certain members, as such payment was duly authorized by a constitutional majority of members. 325 F.2d at 652. After thoroughly examining § 501's purpose and legislative history, the Eighth Circuit held the union leaders' refusal to pay the attorneys fees was a breach of trust and evinced the leadership's failure to refrain from dealing with the union as an adverse party, in violation of § 501. *Id.* at 653. In so holding, the court described the particular behavior that violated the statute:

> [Defendants] have allowed their personal feelings toward appellees to interfere with their duties as officers; have refused to pay the bills even though approved by the membership; have employed various tactics in an unsuccessful attempt to attain local approval for their conduct; have solicited support for their wrongful behavior from the International; and have thus assumed positions adverse to the interests of the local union as expressed in a majority vote…."

*Id.* Ten years later, in *Pignotti v. Local # 3 Sheet Metal Workers Int'l Assn. et al.*, the Eighth Circuit reaffirmed *Johnson v. Nelson.* The *Pignotti* court revisited *Johnson*'s

legislative analysis and considered the Second Circuit's holding in *Gurton*, concluding

that *Gurton* was decided more narrowly based on an erroneous interpretation of the

legislative history that lead to an "unduly restrictive" view of § 501's fiduciary duties.[4]

*Id.* at 834.  Even New York district courts agree *Pignotti*'s and *Johnson*'s analysis of

legislative history is correct, but are nonetheless bound by Second Circuit decisions.

*Agola v. Hagner*, 556 F.Supp. 296, 299 (E.D.N.Y. 1982).[5]

      While the Seventh Circuit has not formally adopted *Johnson/Pignotti*, it has

impliedly done so by relying upon the same case law and legislative history to interpret §

501's scope.  For example, in *Hood v. Journeymen Barbers*, a case decided after *Johnson*

and *Gurton* but before *Pignotti*, the Seventh Circuit explicitly held that § 501, as enacted,

"is precisely that found in the Landrum-Griffin bill approved by the House, and that bill

in turn employs fiduciary language identical to that of the Elliot bill."  *Hood*, 454 F.2d at

1352-53.  In exploring the scope of § 501 fiduciary duty, the court explained, "The

content of the fiduciary obligation in Section 501(a) is outlined only in broad principles,"

citing *Highway Truck Drivers v. Cohen*, 182 F.Supp. 608, 617 (E.D. Pa.).  *Johnson* cited

---

[4] *Gurton* relied on the legislative history of Senate bill s.1555, the "Kennedy-Ervin Bill"—which limited the fiduciary duty to the handling of money and property.  *Agola* v. *Hagner*, 556 F.Supp. 296, 299 (E.D.N.Y. 1983);  *Pignotti*, 477 F.2d at 833.  After passage, S.1555 was sent to the House of Representatives, where four bills were introduced.  Two of those bills, the "Elliot Bill" and the "Landrum-Griffin Bill," contained identical language related to a union officer's fiduciary duty. In recommending the Elliot Bill, the Committee Report stated, "We affirm that the committee bill is broader and stronger than the provisions of S. 1555 which relate to fiduciary responsibilities…. Accordingly the committee bill extends the fiduciary principle to all the activities of union officials and other union agents or representatives."  *Pignotti*, 477 F.2d at 834 (citing I. Leg.Hist. 839); U.S.C.C.A.N. 86 Cong. 1 Sess., 1959, Vol. 2, pp. 2479-2480.  Although the House of Representatives passed the Landrum-Griffin Bill and not the Elliot Bill, the fiduciary provision that was signed into law as § 501 of the LMRDA is identical to that found in the Elliot Bill. *Pignotti*, 447 F.2d at 833.

[5] The Ninth Circuit similarly distanced itself from *Gurton*, explaining, "The position of the court in *Johnson v. Nelson* that § 501 is not limited to breaches of trust directly involving officers' handling of union money or property has been termed the 'majority' view," and holding the Ninth Circuit's citation of *Gurton* "does not commit us to follow *Gurton*."  *Kerr v. Shanks*, 466 F.2d 1271, 1275 n.2 (9th Cir. 1972) (citing *Cefalo v. Moffett*, 449 F.2d 1193, 1198 n. 15 (D.C. Cir. 1971).

9

the same language in *Highway Truck Drivers* to support it's holding that § 501 should receive a broad interpretation and not be limited to management of a union's fiscal matters:

> Section 501, with which we are particularly concerned, is entitled 'Fiduciary responsibility of officers of labor organizations.' This section, quoted earlier, attempts to define in the broadest terms possible the duty which the new federal law imposes upon a union official…. We turn then to Section 501, not expecting to find a detailed command or prohibition as to the particular act complained of, but rather to find a general guide which, properly developed, will lead us to an answer. We feel that that answer here must be in plaintiff's favor.

*Highway Truck Drivers*, 182 F.Supp. at 617. Similarly, *Pignotti*, in concluding other federal circuits had adopted a broad view of § 501, discussed at length the Third Circuit case *Sabolsky v. Budzanoski*, 457 F.2d 1245 (3rd Cir. 1972). *Pignotti*, 477 F.2d at 834-35. *Sabolsky*, like *Hood*, quoted *Highway Truck Drivers* in support of its holding that § 501 "attempts to define in the broadest terms possible the duty which the new federal law imposes upon a union official." 457 F.2d at 1250.

No Seventh Circuit court agrees with Defendants' theory that the Seventh Circuit formally adopted *Gurton* and thus views § 501 claims narrowly. *Lux v. Blackman*, 546 F.2d at 718); *Chathas*, 233 F.3d at 514; *Operative Plasterers' v. Local No. 5*, 794 F.2d 1217, 1220-21 (7th Cir. 1986); *Gee v. Textile Processors, Service Trades, Health Care, Professional and Technical Employees Int'l Union*, 2000 WL 336559, *9 (N.D. Ill., March 28, 2000).

The case that purportedly adopted *Gurton* in the Seventh Circuit is *Lux v. Blackman*. *Lux* involved a handful of LMRDA claims related to the procedure a union president followed in dismissing officers accused of being Communist Party members.

546 F.2d at 715. *Lux* summarily disposed of the § 501 claim in two short sentences, "To decide this issue we do not think it is necessary to explore the full reach of section 501. We are convinced that the provision has no application whatever to the facts of this case." *Id.* at 718 (citing *Gurton* and other cases). Ten years later, the Seventh Circuit held, "[In *Lux*] we seemingly adopted the *Gurton* approach and held that § 501 was not available to redress claims that the appellants were improperly removed from office. On the other hand, in *Hood v. Journeymen Barbers*… we recognized that the legislative history relied upon by the *Pignotti* court was more accurate than that utilized by the *Gurton* court." *Operative Plasterers'*, 794 F.2d at 1221. The Seventh Circuit's position on the scope of § 501 remained ambiguous in March of 2000, when the Northern District of Illinois court held that the Seventh Circuit had not conclusively settled on a broad or narrow interpretation of § 501. *Gee,* 2000 WL 336559 at *9.

Later that year however, the Seventh Circuit adopted a broader reading of § 501, holding, "Although section 501 is primarily aimed at preventing officers from misusing union funds…, *it is not limited to that conduct.*" *Chathas*, 233 F.3d at 514 (emphasis added)(citations omitted). *Chathas* involved a union officer's solicitation of funds from employers to create a social club to host lavish events for union members. These events lead to the officer's successful reelection. The Seventh Circuit held that district court abused its discretion in denying plaintiffs' right to amend their complaint to add a claim under § 501 on the ground that the defendant's conduct was outside the scope of the statute. *Id.* at 501, 514. *Chathas* held the union officer had obtained a personal interest adverse to the union by soliciting *employer* funds and operating a social club, stating, "Such conduct violates section 501 too." *Id.* at 514 (citing *Johnson v. Nelson*, 325 F.2d at

650-53)(other citations omitted).  *Chathas* did not involve handling of the union's money or property.

Lastly, contrary to Defendant's assertion, *Talbot* does not *limit* § 501's scope to handling of union money and property, even though § 501 does "require" as much.  961 F.2d at 666 (indicating Plaintiffs had a viable claim under § 501(a) because they alleged union leaders had colluded with employers in a self-enrichment scheme adverse to the union members' interests, but holding Plaintiffs § 501 claim must fail because they did not meet the pre-filing requirements of § 501(b)).

In addition to the over-arching refusal to expend union funds according to a member-adopted resolution, Defendants breached their fiduciary duty by assuming a position adverse to the interest of the local union as expressed by majority vote. Specifically, business manager Kreuser allowed his hostile personal feelings toward Mr. Lansing to interfere with his duty as a union officer, and Kreuser and business manager Breitlow abused their positions of power by repeatedly trying to disenfranchise retired union members, in violation of the UA Constitution.  (Add'l FOF ¶¶ 42-46; Engle Dep., 38:7-40:5, 51:21-23, 80:22-81:6, 9:15-10:17; 38:7-41:23, 40:23-41:23. Add'l FOF ¶ 68; Breitlow Dep. 125:7-127:9.)  For four years, the Defendants have ignored the union members' resolution to provide a 13th check to retired members.  This is precisely the type of behavior § 501 and the LMRDA as a whole aim to curtail.  *Serpico v. Laborers' Int'l Union of No. Am., et al*, 97 F.3d 995, 998 (7th Cir. 1996)(holding courts should intervene when union leaders exceed their authority by ignoring member's votes); *Chathas*, 233 F.3d at 514; *Johnson*, 325 F.2d at 650-53.  The Defendants had a duty

Case 2:08-cv-00240-CNC   Filed 11/13/09   Page 12 of 31   Document 62

under § 501 of the LMRDA to implement the proposal supported by a majority of the membership. Defendants breached that duty.

### B.    *Gurton* **does not foreclose Plaintiff's claim**

The Second circuit's *Gurton* opinion provides scant analyses of § 501, holding:

> It is equally clear that Section 501 of the L.M.R.D.A. has no application to the present controversy. A simple reading of that section shows that it applies to fiduciary responsibility with respect to the money and property of the union and that it is not a catch-all provision under which union officials can be sued on any ground of misconduct with which the plaintiffs choose to charge them.

339 F.2d at 375. The opinion cites approvingly the district court's analysis of the legislative history, which is an analysis the Seventh Circuit has questioned. *See Operative Plasterers*, 794 F.2d at 1221; *Hood*, 454 F.2d at 1352-54. Unlike *Gurton*, which involved a resolution related to the union's internal voting procedures, the present case is premised upon the union leadership's refusal to expend union funds in accordance with the membership's clearly expressed wishes. Defendants attempt to avoid this provision by stating § 501(a) concerns "the handling of money already in the union's possession….," but cites no authority to support its theory. (Def. Br. at 23.) Seventh circuit case law, however, suggests that an officer's duty with respect to union funds begins not when the actual money is transferred, but when the membership authorizes the creation of a fund. *Tile, Etc., Int'l Union v. Local 25*, 972 F.2d 738, 746 (7th Cir. 1992). The case facts demonstrate the membership properly established the 13th Check Fund when the motion passed on May 24, 2005. The officers, therefore, had a duty to expend those funds in accordance with the motion. 29 U.S.C. § 501(a); *Agola*, 556 F.Supp at 299-300 (finding a *prima facie* § 501 violation for officer's failure to make payments to

striking workers). The condition precedent of collecting the funds through the authorized check off procedure does not negate the officers' fiduciary duty to expend the funds in the form of a 13th check to retirees. *Local 25*, 972 F.2d at 746. Plaintiff Lansing's § 501 claim directly concerns the union officer's fiduciary duty to expend union funds pursuant to the members' wishes.

Defendants breached the fiduciary duty owed to Local 75 members by failing to expend funds properly authorized by a vote of 145 to 100, and by taking a position adverse to the union by failing to implement the vote, attempting to disenfranchise retired members, and acting out of personal animosity. This behavior clearly violates § 501 the LMRDA.

## II. Defendants' proffered reasons for not implementing the 13th Check Motion are pretextual.

Defendants dispute Plaintiff's claim arguing they could not have implemented the 13th check because it violated the Local bylaws, and it was not properly authorized due to insufficient notice and improper voting procedure. (Def. Br. at 13, 17, 23.) Evidence demonstrates these reasons are pretextual. In fact, the 13th Check Motion was not implemented because the Defendants did not agree with it, they did not vote for it, and they did not want to implement it. (Add'l FOF ¶¶ 43, 48-49; Engle Dep., 38:7-40:5; 51:21-23; 80:22-81:6; Breitlow Dep. 118:7-12; Lansing Dec., ¶ 12; Gasperetti Dep., 33:15-35:17.) Defendants abused their leadership positions by refusing to implement the will of the membership.

Evidence that a union's neutral reason for taking a particular action can be overcome by evidence that the union's neutral reason is pretextual. *Ramey v. District 141, Int'l Assoc. of Machinists and Aerospace Workers,* 378 F.3d 269, 284 (2nd Cir.

2004).  *Ramey* involved a breach of duty of fair representation claim against the plaintiffs' union based on a position the union took with respect to the plaintiffs' seniority after a merger.  At trial, the jury found that Defendants had breached their duty because they acted out of animus, rejecting the neutral reason Defendants provided.  *Id.* at 276.  The Second Circuit upheld this finding, and further held that because the union's conduct was based on hostility toward the plaintiffs, it did not matter whether Defendant's position was objectively reasonable but for the finding of hostility.  *Id.* at 277, 284.  In other words, "[t]he *Ramey* court distinguished between a bare challenge to union action and a challenge to union action with evidence of an improper purpose."  *Addington v. U.S. Airline Pilots Ass'n*, 2009 WL 2169164, *14 (D.Ariz. 2009).

In the present case, Defendants argue they could not have breached their fiduciary duty by failing to implement the 13th Check Motion because the Local 75 bylaws prohibited them from doing so, and because the motion was adopted in violation of the procedural requirements of § 501.  (Def. Br. at 13.)  Defendants' arguments must be ignored as pretext, because ample evidence suggests that Defendants failed to implement the 13th Check out of hostility toward the retired members as a group and personal animus toward the Plaintiff.  (P.'s Resp. to PFOF ¶ 23; Lansing Dep. 80:16-21, Schram Dep., 13:24-14:16, 15:12-16; Add'l FOF ¶¶ 44-45; Engle Dep., 9:15-10:17; 38:7-41:23; Engle Dep., 40:23-41:23.)  Moreover, for more than three years after the vote was taken, the Defendants never suggested to the membership that the vote could not be implemented because the bylaws prohibited it and they never claimed the vote violated the UA Constitution or federal labor laws by lacking the requisite notice or privacy.

(Add'l FOF ¶ 47; Breitlow Dep., 92:10-19; Engle Dep., 77:16-78:20; Kreuser Dep., 51:7-14, 55:24-56:2; Lansing Dec. ¶¶ 9-12.)

### A. Defendants were hostile toward the retired members

After Lansing had spoken to Kreuser about the proposed 13th Check Motion, Kreuser solicited a legal opinion regarding whether he could prevent the retired members from voting on the motion. (Add'l FOF ¶ 42; Lansing Dep. 80:16-21.) Kreuser then asked the Executive board members, before the May 24, 2005 meeting, to support him in preventing the retirees from voting on the 13th Check Motion. (P.'s Resp. to PFOF ¶ 23; Schram Dep., 13:24-14:16, 15:12-16.) Kreuser next told the membership that based upon the union's attorney's legal opinion, retired members did not have the right to vote on the 13th Check Motion. (P.'s Resp. to PFOF ¶ 23; Lansing Dep., 80:16-21.) It was only after a challenge to the chair that President Hamilton ruled retired members did have the right to vote. (PFOF ¶ 23; Lansing Dep., 81:10-82:14.)

The union leadership's attempt to disenfranchise the retired members continued. The next year, in April of 2006, a few weeks before Local 75 members were scheduled to vote on wage allocations, the Executive Board voted to prohibit retired members from voting at all on any wage allocation. (Add'l FOF, ¶ 62; Breitlow Dep. Ex. 19.) The following year, the union, led by business manager Breitlow, denied retirees the right to vote on wage allocations at the April 24, 2007 meeting, despite the fact that Lansing had asked Breitlow to contact the UA for a determination of voting rights. (Add'l FOF ¶ 65-66; Breitlow Dep. 120:14-121:3; Lansing Dec. ¶ 13.) Shortly thereafter, Lansing and others filed charges against Breitlow with the UA. (Add'l FOF ¶ 68; Breitlow Dep. 125:7-127:9.) A representative from the UA told Breitlow that retirees did have the right

to vote and Lansing dropped the charges. (*Id.*) Denying retired members the right to vote for any matter was unprecedented in Local 75 before Kreuser and Breitlow. (Add'l FOF ¶ 67; Kreuser Dep., 76:22-77:10.)

Plaintiff strenuously disputes Defendants' contention that they attempted to implement the 13th Check Motion. Rather, Defendants expended their resources to prevent retirees from voting. (*See* Add'l FOF ¶¶ 42, 62-67; P's Resp. to PFOF ¶ 23.)

### B. Union officers did not agree with the vote and did not want to implement it

Several defendants diverted from past practice and openly expressed disagreement with the 13th Check Motion. (Add'l FOF ¶ 50; Engle Dep., 80:22-81:6.) At the May 24, 2005 meeting, then business manager Kreuser vehemently opposed the motion, and engaged in a personal character assassination of Lansing, stating in front of the members, "Just what the hell did you ever do for the union?" (Add'l FOF, ¶¶ 43-45; Engle Dep., 51:21-23, 80:22-81:6, 9:15-10:17, 38:7-41:23, 40:23-41:23.) After the motion passed, Kreuser told the membership he was not in favor of it, and stated he could not promise its implementation. (Add'l FOF, ¶ 46; Engle Dep., 59:17-21.)

Also telling is Breitlow's reaction to the 13th Check Motion during the April 12, 2007 meeting with Lansing. After Lansing had discussed the need to implement the motion, Breitlow replied that he was not in favor of it and had voted against it. (Add'l FOF, ¶ 48; Breitlow Dep. 118:7-12; Lansing Dec., ¶ 12.)

### C. No evidence demonstrates the Defendants' justifications were contemporaneous with their actions

No defendant ever told the union membership the vote could not be implemented because it violated the bylaws, was not a proper secret ballot vote and did not give the

members proper notice. (Add'l FOF ¶ 47; Breitlow Dep., 92:10-19; Engle Dep., 77:16-78:20; Kreuser Dep., 51:7-14, 55:24-56:2; Lansing Dec. ¶¶ 9-12.) First, if the vote was invalid for these reasons, it would have been improper under the UA Constitution and therefore improper to bring to the Pension Board or the Contractors. (PFOF ¶ 3; Breitlow Dep. Ex. 5 at 81.) Defendants did both. (PFOF ¶ 29, 32.) Second, Kreuser told members the motion had to be set up as a jointly-managed ("Taft-Hartley") fund, despite the fact that the second funding mechanism does not contemplate an employer contribution.[6] Kreuser's instance that the motion required a Taft-Hartley fund is unreliable. On August 5, 2005, Kreuser received a letter from the union's legal counsel stating that "*I am in agreement*" that creating a Taft-Hartley fund without a collective bargaining process was not legally possible. (P.'s Resp. to PFOF ¶ 22; Bensky Dec. Ex. 15.) This letter makes it all the more odd that Breitlow told the members in 2008 the 13th Check Motion could not be implemented because the Contractors had not agreed to set up another Taft-Hartley fund; creating an additional joint fund is not possible absent collective bargaining. (Id.; Add'l FOF 74; Breirlow Dep. Ex. 29.) Defendants' present justification is contradicted by their actions at the time they assert they were trying to implement the motion, and therefore should be dismissed as pretext.

Such great factual discrepancies regarding the reasons for refusing to implement the 13th Check Motion preclude summary judgment.

## III. Even if the reasons were not pretextual, defendants are not entitled to Summary Judgment

### A. Defendants' interpretation of the Local bylaws is not entitled to judicial deference.

---

[6] A "Taft-Hartley" fund is jointly managed by employers (contractors) and unions because both employers and employees (union members) contribute to the funds.

Case 2:08-cv-00240-CNC   Filed 11/13/09   Page 18 of 31   Document 62

The Defendants argue they did not breach their fiduciary duty because their failure to implement the 13th Check Motion was based upon their reasonable interpretation of the Local bylaws. (Def. Br. at 13-17.) Specifically, Defendants argue Section 5.2 does not allow the union to "check off dues to funds that are not listed in Section 5.2 of the Bylaws." (Id. at 15.) Defendants conclude that because implementing the 13th Check Motion would require amending the bylaws, and the May 24, 2005 vote could not have done so, Defendants were justified in refusing to implement the motion. (Id. at 16-17.) In this case, however, the Defendants' interpretation is not entitled to deference because there is evidence that the union leaders acted in bad faith, interpreted their constitution to justify prior actions, and advanced an interpretation unsupported by case evidence. In addition, Defendants Kreuser and Breitlow, the most culpable defendants, previously misinterpreted their own bylaws in an attempt to prevent retired members from voting on the very motion they refused to implement. (P.'s Resp. to PFOF ¶ 23; Lansing Dep. 80:16-21; Add'l FOF ¶ 63; Breitlow Dep., 118:16-119:19, 122:13-14, Ex. 23.) These disputed facts preclude summary judgment in Defendants' favor.

Judicial deference to a union's interpretation of its bylaws is not absolute. The Seventh Circuit will uphold a union's interpretation of its governing documents unless the interpretation is patently unreasonable. *Fulk v. United Transp. Union*, 160 F.3d 405, 407-08 (7th Cir. 1998). Yet even this canon comes with caveats. Exceptions to this general rule are found in the very purpose of the LMRDA and are also expressed in case law as necessary to protect union members against abuses of power. In other words, the law does not give union leaders a blank check to interpret their governing documents to avoid liability under federal labor laws. *Local 48 v. United Brotherhood of Carpenters et*

*al.*, 920 F.2d 1047, 1053 (1st Cir. 1990). Federal courts have recognized that judicial intervention is appropriate "to vindicate the purpose of the [LMRDA]." *Dept. of Labor v. Aluminum, Brick and Glass Workers Int'l Union, Local 200*, 941 F.2d 1172, 1177 (11th Cir. 1991)(recognizing a court may apply its own definition to language in bylaws as a means to protect union members against abuse by union officials). Indeed, the Seventh Circuit defends the court's role in shielding union members from abuse of power by union officials. *Serpico,* 97 F.3d at 998-99. Apropos of the present case is the *Serpico* court's explanation of circumstances where a union's interpretation of its bylaws is suspect:

> The most one can say is that a union's top officials can defeat the members' votes by ignoring them—that is to say, by exceeding their powers—as well as by miscounting them, or by disfranchising some members. So there is a judicial role in ensuring that a union's executive board does not take an implausible view of its authority…, an inquiry similar to the one used in review of arbitral decisions: a silly "interpretation" may show that the document wasn't being interpreted, but was being ignored.

*Id.* (citing *Local 48,* 920 F.2d at 1052 and *Newell v. Int'l Brotherhood of Electrical Workers*, 789 F.2d 1186, 1189 (5th Cir. 1986)). These cases indicate that even if a union's interpretation of its constitution is not patently unreasonable, judicial intervention is warranted when there is evidence that the union leaders acted in bad faith, interpreted their constitution to justify prior actions, or advanced an interpretation unsupported by evidence. *Local 48*, 920 F.2d at 1052; *Mason Tenders Local Union 59 v. Laborers' Int'l Union of No. Am., et. al.*, 924 F.Supp. 528, 546 (S.D.N.Y. 1996).

Local 48 relies upon Black's Law Dictionary's definition of "bad faith": "…a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by any honest mistake as to one's rights or duties, but by some interested or sinister motive."

920 F.2d at 1054 (quoting Black's Law Dictionary 127 (5th ed. 1979)). Applying this definition in the context of a merger, *Local 48* held that unconscionable or outrageous actions on the part of union officials may constitute bad faith. *Id.* at 1054.

The same facts that demonstrate the Defendants' reasons for refusing to implement the 13th Check Motion were pretext govern here: personal animosity, clear opposition to the vote, and attempt to prevent retirees from voting on the motion. When it became clear to the Defendants that they would have to answer for their actions in this law suit, they scrambled to interpret the bylaws to justify their inaction, notwithstanding that their interpretation deviated wholly from past practice. (*See generally* P.'s Resp. to PFOF ¶ 35.) Specifically, every single fund listed in section 5.2(c) of the bylaws was established long before the fund was included in the bylaws. (Id.; Bensky Dec. Ex. 3; Lansing Dec. ¶ 4, Ex. 1 & 2; Breitlow Dep. Ex. 4; Breitlow Dep., 31:13-35:12; Ligocki Dep., 23:16-17, 24:19-23; Lansing Dec. ¶ 5, Ex. 3.) The Defendants' hostility toward the plaintiff and the retirees as a group, the tactics employed to prevent the retirees from voting on the motion, the disenfranchisement of retirees at subsequent allocation meetings, together with complete deviation from past practice are outrageous actions that may constitute bad faith.

Next, courts may reject a union's interpretation of its governing documents as post-hoc rationalization when there is no evidence in the record to support the union's theory. *Wisconsin Cheese Group, Inc. v. V & V Supremo Foods, Inc.*, 537 F.Supp.2d 994, 1002 (W.D. Wis. 2008)**;** *Local 48,* 920 at 1052; *See also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 127 S.Ct. 2339 (2007)(upholding federal agency's

interpretation of a statute because there was no evidence the interpretation was a post-hoc rationalization of a past agency action).

*Local 48*, cited approvingly by the Seventh Circuit, detailed when a union's interpretation of its own documents may rejected:

> Yet, whatever the specific formulation of the test, the circuits are in agreement that the proper focus of judicial inquiry is on the reasonableness of the union's interpretation of its constitution *at the time of the decision*, not on a *post hoc* evaluation of the reasonableness of the underlying action…. [P]ut another way, whether there was arguable authority for the officer's act from the officer's viewpoint at the time."

920 F.2d at 1052 (emphasis added)(citations omitted).

Certainly, if Kreuser *knew before the May 24, 2005* membership meeting that implementing the 13th Check Motion required amending the Local bylaws (as he claims in his affidavit), he would have said something to somebody *at the time.* (*See generally* PFOF ¶ 22 and P.'s Response to PFOF ¶ 22.) But he did not. He did not tell the executive board the bylaws prohibited establishing this fund, he did not tell the president, he did not tell Mr. Lansing or Mr. Ligocki, he did not tell the UA, and he did not tell the membership. (*See generally* Add'l FOF ¶ 47, 74, 75; Kreuser Dep., 51:7-14, 55:24-56:2; *see also* Add'l FOF ¶¶ 74-75; Breitlow Dep. Ex. 29; Bensky Dec. Ex. 2.) Instead, he jumped through hoops in an attempt to prohibit the retirees from voting on the motion, in violation of the UA Constitution, and verbally assaulted Mr. Lansing during the meeting. (*See* Add'l FOF ¶¶ 42-46, 62-70.) The Defendants' argument that they could not implement the 13th Check Motion because it required amending the bylaws, an argument introduced nearly four years after the vote, is simply not credible, and amounts to nothing more than a post-hoc rationalization for the Defendants' refusal to implement the will of

the members. *Local 48,* 920 F.2d at 1052. This after-the-fact interpretation is patently erroneous, unreliable, and unworthy of judicial deference.

Lastly, federal case law suggests a union's interpretation of its governing documents is subject to judicial review to the extent that the interpretation is supported by evidence in the case. *Mason Tenders*, 924 F.Supp. at 546 (explaining where the executive board's interpretation of the international constitution "does not contradict a specific constitutional limitation *and* is supported by evidence *and* is not 'patently unreasonable,' that interpretation must be upheld." (emphasis added)(citations omitted).

Evidence in this case contradicts the Defendants' interpretation that the bylaws prohibit the Local from collecting money from members and expending the same in accordance with a majority vote. First, if any Defendant thought at the time of the vote or even soon thereafter that an amendment to the bylaws was necessary, no Defendant ever said as much to anyone. Executive Board meeting minutes for all meetings that occurred between March of 2005 and November of 2007 show that the executive board never even discussed amongst themselves needing to amend the bylaws to implement the 13th Check Motion. (Add'l FOF ¶ 75; Bensky Dec. Ex. 2.) Further, Defendants' interrogatory answers indicate they devised their interpretation of Section 5.2 of the Local bylaws well after this suit was filed. (P.'s Resp. to PFOF ¶ 22; Breitlow Dep. Ex. 12 at 2.) Lastly, every fund listed in section 5.2(c) of the bylaws was established well before the fund was added to the bylaws, and therefore the union's past practice directly contradicts Defendants' interpretation. (P.'s Resp. to PFOF ¶ 35.) Moreover, Mr. Kreuser, who was the primary person responsible for implementing the motion during his

tenure as business manager, demonstrated no knowledge or interest in the union's legal documents. (Add'l FOF ¶¶ 58-60; Kreuser Dep. Ex. 74 at 1, 70:7-71:10; 15:21-16:2.)

For these reasons, Defendants interpretation of the Local bylaws is unreliable and undeserving of judicial deference.

### B. Defendants are not entitled to benefit from their own wrongdoing

The LMRDA and UA Constitution require unions to run elections in accordance with democratic principles, which include adequate notice and voter privacy. 29 U.S.C. § 411(a)(1)(A). (PFOF ¶ 3; Breitlow Dep. Ex. 5, pg. 81.) It is the union official's responsibility to conduct proper elections, it is not up to individual members to determine what type of notice or voting procedure should be used. (Add'l FOF ¶ 53-54, 57; Hamilton Dep., 7:23-8:3; 10:4-6, Breitlow Dep. Ex. at 9, 13; Hamilton Dep., 32:10-17; Kreuser Dep., 27:11-18.) Even if the notice and voting procedures were insufficient under the LMRDA and the UA Constitution, Defendants' argument fails.

Assuming, *arguendo*, that the meeting notice and voting procedures were insufficient under the LMRDA, defendants should be estopped from asserting those defenses. Defendants were responsible for writing and sending out the meeting notice. They were in charge of the meeting agenda and they were in charge of conducting the vote. Now, four years later, these same Defendants turn around and claim that everything they did was wrong. They argue this wrongdoing absolved them of their responsibility to implement a measure supported by a majority of members.

Courts have the discretion to withhold a remedy from a union leader who violates the LMRDA, then asks the courts to sanction his wrongdoing. *Marshall v. Local 1010, United Steel Workers of America*, 664 F.2d 144, 145-46 (7th Cir. 1981). In *Local 1010*,

Case 2:08-cv-00240-CNC   Filed 11/13/09   Page 24 of 31   Document 62

incumbent union leaders, charged with running a union election, failed to hold a secret ballot vote. When the incumbents lost by a two-to-one margin, they contacted the Secretary of Labor, who filed a lawsuit aiming to void the election results on the basis that it had been conducted in violation of the LMRDA. *Id.* at 46-47. The Seventh Circuit held that the LMRDA did not require the court to order a new election "where an incumbent union faction intentionally violates the Act, loses the election and then seeks to rely on its own violations to invalidate the election."[7] *Id.* at 147. The court further concluded the plaintiff's requested remedy under the circumstances was "inconsistent with the spirit of the LMRDA." *Id.* at 149.

In the present case, Defendant Kreuser was responsible for creating the meeting notice. (P.'s Resp. to PFOF ¶ 17; Kreuser Dep., 29:15-18.) Defendant Hamilton was responsible for chairing the meeting and upholding the UA Constitution. Kreuser was responsible for supervising Hamilton in his duties. (Add'l FOF ¶¶ 55-56; Hamilton Dep., 7:12-18, 10:4-6, 30:13-15; Breitlow Dep. Ex. 4 at 14.) First, Defendants argue that because the word "dues" did not appear in the notice, the notice was invalid under the UA Constitution and LMRDA. (Def. Br. at 19.) By Defendants' reasoning, nothing would prevent a business manager who disagreed with a proposed dues increase from omitting the word "dues" from the notice as a means to invalidate the majority vote. An aggrieved member would have no recourse to prevent this abuse of power.

Next, Defendants argue they could not implement the 13th Check Motion because the balloting that occurred was improper under the UA Constitution and LMRDA. What is most outrageous about Defendants' argument is that they make it after having testified

---

[7] The remedy requested in *Local 1010* was under § 482(c) of the LMRDA, which deals with relief from voting irregularities. 29 U.S.C. § 482(c).

under oath that *no balloting had occurred at all* with respect to the 13th Check Motion. (PFOF ¶ 24; P.'s Resp. to PFOF ¶ 24; Hamilton Dep., 30:13-32-17; Kreuser Dep., 40:1-14; Brietlow Dep., 7:9-17, 62:8-64:9, 74:14-76:23, 85:21-86-4, 147:7-15; Gasperetti Dep., 32:22-33-7.)  Defendants Hamilton, Kreuser, Breitlow and Gasperetti all testified at deposition that the vote on the 13th Check Motion occurred first by a voice vote, then by a "standing" or "division of the house" vote, wherein the members stand to one side of the room or the other to indicate their preference.  (Id.)  Taking this testimony as true, at best, the Defendants were grossly negligent in failing to hold a secret ballot vote.  At worst, they willfully, knowingly and blatantly violated the LMRDA in attempt to invalidate a vote they disagreed with.  Allowing the Defendants to invalidate the vote would be allowing them to benefit from this gross misconduct.  The LMRDA forbids this result. *Local 1010*, 664 F.2d at 150.

Allowing Defendants to successfully assert this defense would allow Local 75 officials to invalidate *any* majority vote on the basis that the vote was improperly noticed or conducted.  The LMRDA was enacted to prevent such results.  *Local 1010*, 664 F.2d at 150 (holding the LMRDA aims to prevent improper conduct by union officials).

C.    **The 13th Check Motion is permissible under the bylaws, was properly noticed and was properly voted upon.**

The Local bylaws do not prohibit the membership from voting to collect money from members, by way of an hourly check-off, they do not prevent the establishment of a depository for those monies, and they do not prevent expenditure of such monies for a duly authorized purpose.  Defendants base their entire argument on the idea that implementing the 13th Check Motion would violate section 5.2 by characterizing the check off as a "dues increase".   They reason that because Section 5.2(c) does not list a

"13th Check Fund", the bylaws do not permit collection of dues for that purpose. (Def. Br. at 15-16; PFOF ¶ 6; Kreuser Aff. ¶3.) Defendants then conclude that members could lose their status of "good standing" or be suspended for failing to check-off wages for the 13th check fund. (PFOF ¶ 9; Breitlow Dep. Ex. 4, pg. 7). First, as discussed, past practice indicates that funds listed in section 5.2 were established long before they were added to the bylaws. (P.'s Resp. to PFOF ¶ 35; Bensky Dec. Ex. 3; Lansing Dec. Ex. 2.) Second, nothing in the motion itself suggests that the check-off amounts to a "dues" increase, or that contributions to the fund (via the check-off procedure) were mandatory.[8] Examining article V of the bylaws in their entirety, nothing prevents the membership from voting to collect and expend money in accordance with the majority's wishes.

Both the LMRDA and the UA Constitution state dues or assessments may only be increased upon a "secret ballot vote." 29 U.S.C. § 411(a)(3); (PFOF ¶ 3). A secret ballot vote may occur by paper ballot or voting machine and must be "cast in such a manner that the person expressing such choice cannot be identified with the choice expressed." 29 U.S.C. § 402(k). A union "*may* provide voting booths, partitions *or other physical arrangements permitting* privacy for the voter while he is marking his ballot." 29 C.F.R. § 452.97 (emphasis added). Courts have invalidated votes when members have complained that the union officials failed to provide adequate measures to insure privacy. *Hummel v. Brennan*, 469 F.Supp. 1180, 1188, 1192-93 (E.D.PA 1979)(holding balloting procedures were insufficient because voters marked ballots in their seats, members were not instructed they could vote in secret or in other areas of the hall, past practices had insured greater secrecy, and the union hall provided sufficient physical space to have

---

[8] *See* Section 5.3, which requires the local to establish a *voluntary* political action fund.

allowed greater privacy). *Hummel* further emphasized the LMRDA's policy to protect rank-and-file members against abuses of power by union leadership. *Id.* at 1192.

Witness accounts of the vote vary considerably. (PFOF ¶ 24.) Several witnesses testified that members were free to vote in any location they chose, and there is no evidence that any voter saw another's ballot, tried to look at another's ballot or were able to identify another voter's choice. (P.'s Resp. to PFOF ¶ 21; Holm Dep., 45:10-12; Ligocki Dep., 58:4-11.) Mr. Lansing testified voting occurred in secret in a long hallway. (Id.; Lansing Dep., 91:15-92:19.) Another member testified that invalidating the vote for lack of secrecy is "silly", "nonsense", and "grasping for straws." (Add'l FOF ¶ 51; Engle Dep., 77:20-78:15.) What this issue really boils down to, however, is that the factual discrepancies preclude summary judgment, because by at least one account of the events, viewed in the light most favorable to the plaintiff, a secret ballot vote occurred.

Responding to the Defendants' notice argument, the LMRDA dictates that union members receive "reasonable notice of the intention to vote upon [a dues increase or assessment]." 29 U.S.C. § 411(a)(3). Slightly more specific, the UA Constitution requires written notices informing members of the time and place where the vote will be taken. (PFOF ¶ 3.) The LMRDA's notice provision is vague and cases suggest the "critical query" is whether the notice *can be fairly said* to have conveyed an intention to vote on a dues increase. *Gates v. Dalton*, 441 F.Supp. 760, 763 (E.D.N.Y. 1977). In addition, "[t]he reasonableness of a notice under § 411(a)(3)(A) must be interpreted based upon the factual circumstances of each case." *Hummel*, 469 F.Supp at 1188. The *Gates* notice said, "Our next regular meeting… will be a special meeting to discuss further financing of the building and a possible change in our dues structure." *Gates*, 760

F.Supp. at 762.  The court rejected this notice because it failed to mention that a vote

would occur at all, and did not describe what purpose the dues increase would benefit.

*Id.* at 763.  Courts have rejected notices that failed to specify the date in which the vote

would occur.  *Hummel v. Brennan*, 469 F.Supp. 1180, 1188 (E.D.PA 1979).

Two notices were mailed to all Local 74 members prior to the meeting.  (PFOF ¶

17; Add'l FOF ¶ 40; Kreuser Dep., 29:15-18, 30:22-32:11; Ex. 68, 69.)  The first one

included the date, time, and place of the meeting, and in no uncertain terms explained

what vote would entail.  This notice was mailed out on brightly colored paper and reads

in relevant part:

> This month's union meeting is a very important meeting to
> attend.  We will be addressing the needs of each of our
> benefit funds and approving the final appropriations of
> monies out of our raise due on May 29, 2005.
>
> It is recommended that every member of Plumbers Local
> 75 make every effort to attend.  An important issue will be
> the final decision on money appropriations into the Pension
> Fund.  A SPECIAL REQUEST MAY BE MADE AND
> VOTED ON FOR MONEY OUT OF YOUR RAISE TO
> BE USED TO IMPROVE CURRENT PENSION
> BENEFITS FOR ALL RETIREES.  IT IS HIGHLY
> RECOMMENDED YOU BE IN ATTENDANCE TO
> HEAR THIS PROPOSAL.

(Stip. Facts ¶ 20; Kreuser Dep. Ex. 68.)  While members testified there was no doubt in

their minds what this notice was conveying, the person who drafted the notice now

claims it was unclear.  (Def. Br. at 18)(P.'s Resp. to PFOF ¶ 17; Conway Dep., 43:19-

44:7; Ligocki Dep., 30:12-31:17.)  Defendants argue, "The term 'money out of your

raise' has a specific meaning different from a dues increase," but cites no legal or factual

authority to support this ridiculous contention.  On the contrary, ordinary members used

the terms "allocation", "dues", and "check off" interchangeably.  (P.'s Resp. to PFOF ¶

18; Engle Dep., 67:4-15; Holm Dep., 42:9-43:20; Conway Dep., 42:22-44:7.) A witness testified that members rarely discussed or were concerned over whether money was deducted pre-tax or post-tax from their paychecks. (P.'s Resp. to PFOF ¶ 6; Engle Dep., 67:12-68:14.) The notice speaks for itself.

## CONCLUSION

Defendants present a litany of reasons why they were justified in not implementing the vote, but those reasons all amount to asking this Court to find they did not breach their fiduciary duty on account of their own gross negligence and possibly even willful dereliction of duty. What is at stake in this case is whether a union leader can escape liability under the LMRDA by defending a clear breach of fiduciary duty with evidence of his own wrongdoing. Accordingly, Plaintiff respectfully requests this Court deny Defendants' motion for summary judgment.

Respectfully Submitted on this 13th day of November, 2009.

/s/ Edward R. Garvey
Edward R. Garvey
SBN 1010028
Anne Bensky
SBN 1069210
Garvey McNeil & Associates, S.C.
One Odana Court
Madison, Wisconsin 53719
Telephone: (608)256-1003
Facsimile: (608)256-0933
garvey@gmmattorneys.com
bensky@gmmattorneys.com

Thomas Halloran
WSB No. 1015944
PETRIE & STOCKING, S.C.
100 E. Wisconsin Ave., Ste 1500
Milwaukee, WI 53202
Tel: 414.276.2850
Fax: 414.276.0731

thalloran@petriestocking.com